AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT



for the

District of Connecticut

2019 APR -1 A 11: 31

U.S. DISTRICT COURT
NEW HAVEN, CT.

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

All information associated with ▮▮▮▮▮▮

stored at premises controlled by ▮▮▮▮▮▮

)
)
)
)
)

Case No.

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the ▮▮▮▮▮▮ District of ▮▮▮▮▮▮ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 951 | Unregistered Agent of Foreign Government |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI Special Agent Daniel Veale

*Printed name and title*

Sworn to before me and signed in my presence.

Date: **3/29/19**

*Judge's signature*

City and state:  New Haven, Connecticut

Hon. Robert M. Spector, U.S. Magistrate Judge

*Printed name and title*

THE UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT



IN THE MATTER OF THE UNITED STATES'
APPLICATION FOR WARRANTS TO SEARCH
INFORMATION ASSOCIATED WITH THE TWO
EMAIL ACCOUNTS AND TWO
ACCOUNTS ███████████████ WHICH
IS STORED AT PREMISES CONTROLLED BY
███████████████, WHICH
IS STORED AT PREMISES CONTROLLED BY
███████████████,
ASSOCIATED WITH ███████ AND
DSID: ███████ ASSOCIATED WITH
███████, WHICH LATTER TWO
ACCOUNTS ARE STORED AT PREMISES
CONTROLLED BY ███████

Misc. Case No. 3:19-mj-109(RMS)

March 29, 2019

**Filed Under Seal**

## CONSOLIDATED AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR FOUR SEARCH WARRANTS

Daniel Veale, a Special Agent of the Federal Bureau of Investigation, New Haven Division,

being duly sworn, deposes and states as follows:

### I.   INTRODUCTION AND AGENT BACKGROUND

1.    I have been employed as a Special Agent with the FBI since June 2014. I am

currently assigned to the FBI's New Haven office, where I investigate crimes related to counter-

intelligence, including espionage and the theft of trade secrets. During my time as an FBI Special

Agent, I have become familiar with some of the ways in which individuals who commit espionage

or steal trade secrets and other protected information operate.

2.    During the course of my career, I have participated in criminal and national security

investigations. My participation in those investigations has included coordinating controlled

purchases of evidence, utilizing confidential informants, cooperating witnesses and undercover

officers; participating in the execution of search and arrest warrants; conducting electronic and physical surveillance; analyzing financial and call detail records; use of court-authorized interception of wire and electronic communications; and interviewing individuals and other members of law enforcement regarding the investigations.

3.     I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4.     I subscribe this affidavit in support of an application for four search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to require the email service providers identified below to disclose to the Government copies of the information (including content of communications) further described in Section I of Attachment B, for the period January 1, 2012 to the present, which information is associated with ▓▓▓▓ ("hereinafter, "TARGET ACCOUNT ONE"), ▓▓▓▓ ("hereinafter, "TARGET ACCOUNT TWO"), DSID ▓▓▓ associated with ▓▓▓ ("hereinafter, TARGET ACCOUNT THREE"), and DSID ▓▓▓ associated with ▓▓▓ ("hereinafter, "TARGET ACCOUNT FOUR"), all further described in Attachment A.  The information sought for TARGET ACCOUNT ONE is stored at premises owned, maintained, controlled, or operated by ▓▓▓ an email service provider headquartered, and which accepts service of legal process, at ▓▓▓ for TARGET ACCOUNT TWO, at premises owned, maintained, controlled, or operated by ▓▓▓ an email service provider headquartered, and which accepts service of legal process, at ▓▓▓ and for TARGET ACCOUNT THREE and TARGET

- 2 -

ACCOUNT FOUR, both at premises owned, maintained, controlled, or operated by ██████ ██████ a company headquartered at ██████████████████ To clarify: TARGET ACCOUNT ONE and TARGET ACCOUNT FOUR involve the *same* e-mail account, namely, ██████████████ however, they consist of entirely separate storage locations – one on ██████ e-mail servers, the other on ██████ "cloud" storage servers. Hence depending on each company's storage procedures and protocols, each storage location may include items that are not retained and preserved in the other storage location. Upon receipt of the information described in Section I of Attachment B, government-authorized personnel will review that information to locate the items described in Section II of Attachment B.

5.     Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of search and seizure warrants, I have not included each and every fact known to me regarding this investigation. Rather, I have set forth only those facts that I believe are sufficient to establish probable cause.

## II.     **JURISDICTION**

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3). *See* 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## III. BACKGROUND

8.      For the reasons detailed below, I believe there is probable cause to conclude that TARGET ACCOUNT ONE, TARGET ACCOUNT TWO, TARGET ACCOUNT THREE, and TARGET ACCOUNT FOUR (hereinafter collectively the "TARGET ACCOUNTS") contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 951 (failure to register as agent of foreign government) (the "Subject Offense"). Among the subjects of this investigation is ███████████████████████ was born in the ███████████ ███████ and became a naturalized U.S. citizen in or about November, 2009.

## IV. PROBABLE CAUSE

9.      The FBI began investigating ███ for the Subject Offence in or about November 2016. Based on my training and experience, involvement in this investigation, conversations with other law enforcement officers, including the FBI's ███████████ experts, and my review of open source materials, I have learned the following:

### Curriculum Vitae

10.      A review of a cached version (in or about October, 2017) of a website titled ███████████████████" revealed information pertaining to ███ background and affiliations. The website identified ███ as the Chairman of the Department of Biochemistry and Molecular Biology ███████████████████████████████████████ ███████████████████████████(previously known as ███████████████ ███████; it also lists ███ as the Director, ███████████████████████ on Single Cell Technology and Application. A review of the CV's listings under "Principle Employment History" identified his two most recent positions as Professor and Chairman of Biochemistry and Molecular Biology, ███████ (2016- ), and as Research Scientist/Principle

- 4 -

Investigator, entered as Associate Research Scientist, in the Department of Genetics, ■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

    11.    A further review of the website titled ■■■■■■■■■■■■■■■■ revealed

the following information under "Selected Professional Honors and Services": ·

        a.  Consultant Scientist: Department of Genetics. ■■■■■■■■■■■■

                ■■■■■■■ USA.

        b.  President, ■■■■■■■■■■■■■■■■■■■■■■■■■■

                ■■■ 2018 (elected), and previously as its Vice President for Academics,

                Principal Coordinator of ■■■■■ Academic Committee (2013-2016).

        c.  Vice President, Society for Biochemistry and Molecular Biology in ■■■■

                ■■■■■■■ (2016- ).

        d.  Associate Chief-Editor, ■■■■■■■■■■■■■■■■■■■

                ■■■■ (2016- )(in preparation).

        e.  Co-founder, ■■■■■■■■■■■■■■■■■■ (2012- ).

        f.  Invited Funding Reviewer, ■■■■■■■■■■■■■■■■

                (2014, 2015); ■■■■■■■■■■■■ (2015); ■■■■■■■

                ■■■■■■■ (2014).

        g.  Distinguish Gust (sic) Professor, in ■■■■■■■■■■■■■■

                ■■■■■■■ (2012-2015).

    12.    A further review of the website titled ■■■■■■■■■■■■ under

"Position Openings" revealed a section seeking applicants for six positions of tenure-track, high-

level talent track Professor, or Associate Professor in molecular biology at both the university

■■■■■■■■■■■■■■■■■■■■■■■■■■. Also, under a section titled

- 5 -



"Postdoctoral Fellow for ▊▊▊▊▊ the website described three open positions at ▊▊

laboratory.

13     A review of a website, ▊▊▊▊▊▊ associated with ▊ on 02

October 2018 revealed the following in the "History" section of the website. "At present, it ▊▊

becomes a candidate university jointly to be constructed by ▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ The

"Leadership" section of the ▊▊ website listed nine faculty members; the first listed leader,

▊▊▊▊▊▊▊ was identified as ▊▊▊▊▊▊ a common title given to a leader associated

with ▊▊▊▊▊▊▊▊; the third listed leader, ▊▊▊▊▊▊ was identified as

▊▊▊▊▊▊ for ▊▊▊▊▊▊▊▊▊▊▊▊.

## Travel Analysis

14.     According to Department of Homeland Security (DHS) database queries, over the

approximate, one-year period between October 13, 2017 and October 2, 2018, ▊▊ spent

approximately 300 days outside of the US. ▊▊ exclusively traveled between John F. Kennedy

Airport in New York (JFK) and ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

## ▊▊ University Affiliation

15.     A ▊▊▊▊▊▊▊▊▊▊▊ website includes a faculty profile page

associated with ▊▊ According to the faculty profile, ▊▊ became an Associate Research

Scientist in ▊▊▊▊▊▊▊▊▊▊▊ in 2004, and was promoted to Research Scientist

in 2014. On April, 24, 2018, a ▊▊▊▊▊ administrator confirmed that ▊▊ position as a

Research Scientist with ▊▊▊▊▊▊ had ended in February of 2018.   However, the

administrator also advised that ▊▊ may still be paid as a consultant for a patented technology

that he was involved with while at ▊▊ The administrator further advised that ▊▊ continued

- 6 -

association with the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ involves access to sensitive technology that is referred to as "superstar technology" by the members of the university.

16. In fact, evidence indicates that ▮▮▮ has continued to access the facilities of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in 2018. The ▮▮▮▮▮▮▮▮▮▮▮▮ is located in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. According to DHS database queries, ▮▮▮ traveled from ▮▮▮ to the United States on October 7, 2018, and departed from the United States to ▮▮▮ on October 19, 2018. Information provided by a member of the ▮▮▮▮▮▮▮ Police Department showed that during the eleven days between those two flights ▮▮▮ physically accessed the ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is located) ten times. Among other occasions, the pertinent badge access logs showed that ▮▮▮ badge was utilized to access the ▮▮▮▮▮ on October 17, 2018, two times within a four-second interval. A subsequent review of CCTV footage revealed that ▮▮▮ entered the building with an unknown individual, and hence likely utilized his badge to allow for that unknown individual's unauthorized access to the ▮▮▮▮▮▮▮▮ Additional review of badge access logs documented that ▮▮▮ last known access to a ▮▮▮ ▮▮▮ building was on October 18, 2018.

### ▮▮▮▮▮▮▮▮▮▮ Affiliation

17. Information obtained through the investigation identified ▮▮▮ as a co-founder of ▮▮▮▮▮▮▮▮▮▮▮▮ located in ▮▮▮▮▮ Connecticut. According to the ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ website, in or about February 2013, ▮▮▮ was a founding investor for ▮▮▮ which was partnered with the University of Connecticut's ▮▮▮▮▮▮▮▮ ▮▮▮

18. Records obtained from Bank of America identify an account in the name of ▮▮▮▮▮▮▮▮▮▮▮▮ (hereinafter, the ▮▮▮ account"), for which ▮▮▮

- 7 -

signed the application in or about October 2012.  The account records listed ▮ as Director of the company, and ▮ as Chief Technology Officer.  Other ▮ account records revealed an incoming wire transfer in or about October 28, 2016 for $2,999,975, from ▮ ▮; the ▮ sending account was associated with an HSBC ▮ account number.  A review of the account activity revealed the single deposit from ▮ as the largest of all deposits received by the ▮ account between in or about May 2016 and in or about June 2017, equal to almost the total of all other deposits received during that time period.  Records obtained from Connecticut's state-financed venture capital fund, Connecticut Innovations, Inc., show that in or about November 2013, ▮ also received a three-year grant ▮ from the Connecticut ▮ Fund.

19.     A review of open source information revealed that ▮ ▮ is affiliated with ▮ According to ▮ own website, ▮ is a large medical and healthcare group covering every aspect of the medical and health care industry, and operates under the direct supervision of the ▮ State-owned ▮ ▮

20.     The foregoing facts are consistent with the findings of a ▮ report issued by the Office of the United States Trade Representative ("USTR"), which "found that, at multiple levels of government – central, regional, and local – ▮ has directed and facilitated investment in, and acquisition of, U.S. companies and assets in technology-intensive sectors and

- 8 -

in U.S. technology centers."[1] The USTR found those practices fully operative across the field of

biotechnology, where increased overseas investments were found to "coincide[] with an array of

██████████████████ policy statements and implementing measures that are geared to promote

[bio]technology transfer."[2] The USTR made clear that those efforts involve extensive control by

███████████████████

> [T]he acquisition of U.S. companies and assets in these sectors. . . . align with state
> objectives and policies, and are often undertaken by [state enterprises] ██████████
> ████████████████████████████████ Even when undertaken by
> companies in which the government does not own an observable controlling stake,
> the transactions identified are frequently guided and directed by the state. ████
> members often act as board members and officers of these companies, and are
> responsive to state directives. In addition, many of these transactions are funded by
> state-owned entities or banks, often in situations where comparable commercial
> financing would have been unavailable.[3]

According to senior U.S. national security officials, these practices on the part of the ████████

████████ encompass not just extensive business investment and development, but also theft of

intellectual property on a massive scale. In 2017, ████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

████████ wrote in the New York Times:

> ████████████████ with the encouragement of ███████████████████ and often
> the active participation of government personnel, have been pillaging the
> intellectual property of American companies. Altogether, intellectual-property theft

---

[1] Office of the United States Trade Representative, ████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████

[2] *Id.*, 102.

[3] *Id.*, 193.

costs America up to $600 billion a year, the greatest transfer of wealth in history. █████ ███████████████████

**Leadership Role in** ███████████████████████████

21.     Information obtained through the investigation identified ████ as the President of

███████ (2018). Based on my training, experience, involvement in this and other investigations

involving China, and review of open source materials and conversations with FBI subject-matter

experts on ██████ I have learned the following:

    a.     The ████████████████████████████ is an

        organization that connects the ████████████████ science and

        technology professionals. Although ██████ identifies itself as a non-

        governmental organization, I am aware that ██████ ████████████

        ████████████ ██ example, ██████ ██████████ website

        explains that the organization is "a constituent member of the country's top

        political advisory body ████████████████████████

        ██████████

    b.     ██████ has a United States partner ███████████ - that operates in the

        United States. ████████ membership includes U.S. residents who hold

        positions at ████████ ██████████ institutions. The organization's

        conferences and events are attended by █████████████ officials. The



4 █████████████████████████████████████
████████████████████████████████

- 10 -



stated mission of ▇▇▇▇ is to promote "personnel and information" exchanges between the United States ▇▇▇▇ in scientific and technological fields. The ▇▇▇▇▇▇ uses organizations like ▇▇▇▇ to facilitate the recruitment of highly skilled ▇▇ scientists and technologists living in the United States to, among other things, use their access to technology in the United States for the benefit of ▇▇

22. A query on 29 November 2018 of an open source Internal Revenue Service ("IRS") database for ▇▇▇▇▇▇ did not reveal a 501(c)(3) status; however, ▇▇ was listed on the IRS's "Publication 78" Data List, which according to the IRS website, lists "organizations eligible to receive tax-deductible charitable contributions." And in fact, a query of the IRS's Publication 78 list turned up an IRS letter dated ▇▇▇▇, confirming that ▇▇▇▇ had been granted public charity status as a 501(c)(3).

23. In or about September of 2018, a Confidential Human Source (CHS-1)[5], reported that ▇▇ is the President of ▇▇▇▇ and the Dean of the Biochemistry Department at ▇▇ CHS-1 further reported that ▇▇ has been traveling to the US to recruit individuals from the US for ▇▇ and other Universities located in ▇▇ CHS-1 advised that ▇▇ is a recruiter for the ▇▇ government's ▇▇▇▇ CHS-1 indicated that it was CHS-1's belief that someone from the ▇▇ government likely approached ▇▇ to task him to recruit individuals in the US to

---

[5] CHS-1 has direct access to individuals associated with ▇▇▇▇, and has been providing information to the FBI for approximately nine months. Much of CHS-1's information has been corroborated by the investigation conducted by members of the FBI and other law enforcement members. CHS-1 has not been paid for his/her information. At the same time, it is possible that as a non-citizen, CHS-1 may have an implicit expectation of benefitting in his/her immigration status as a result of such cooperation, but no such benefits have been expressly promised.

In or about October of 2018, CHS-1 further advised that ▮ government officials often identify experts in or from ▮ within a particular field of interest, and subsequently task such identified experts to recruit United States persons from that same field to relocate and bring their skill sets to ▮.

24.      A query of the website, ▮ revealed a news article dated May 27, 2018, written in ▮ characters. A translation of the article's content included a description of a May 23, 2018 meeting between ▮, acting as the ▮ President. ▮ was identified as the capital and largest city in ▮ ▮ article reported that ▮ welcomed the delegation led by ▮ and briefly introduced ▮ and its technological innovation. According to the article, ▮ advised that the competition in the future would be ▮, and she invited overseas ▮ for innovation, entrepreneurship and wealth creation. As also reported, ▮ stated that ▮ would fully play a role of bridging and linking to promote ▮ for more overseas ▮ to come to the city for innovation and entrepreneurship.

25.      A query in or around April 2018 of a website associated with ▮ revealed an invitation, dated February 5, 2018, for the ▮

▮ The invitation revealed that the summit was organized by ▮ and would be hosted by ▮, with assistance both from U.S. chapters and offices, and from points of contact stationed in ▮ as well as with support and collaborations from many affiliated organizations in both the US and ▮ The invitation further described the conference as having three major themes: highlights of advances in science and technology; innovation projects and talents matchup; and ▮ technological and economic

- 12 -

exchange and cooperation. The day three agenda listed ██████████████████████████

██████████████████████ Well-known ███████ entrepreneurial parks, technology incubators,

universities, and corporations are being invited to hold conferences on the subjects of innovation

and entrepreneurship, intelligence, project investment matching, ████████████████ The

invitation was signed both by ██ as President, and by ███████████ as Chairman of the Board,

████████ 2018.

26.     In or about September of 2018, CHS-1 advised that the ██ Ambassador from

Washington, D.C. and the New York ████████████ had been invited to attend the

████████ summit. CHS-1 further advised that government officials from ██ will travel to

the US for the summit to recruit individuals to ████

27.     A review of the brochure for the summit, titled ██████████████████████

██████████ ██ ████████████████████████████████████████████████

████████████████████████ revealed a list of six speakers scheduled to deliver

opening remarks during the summit. ███ was listed as one of those opening speakers, along with

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

28.     According to the ██ General Counsel's office, the University does not have a

requirement that ██ researchers and professors report their outside involvement with ████████

groups and organizations, nor does it seek to investigate potential conflicts of interests that might

arise with such outside involvements. Accordingly, it is quite possible that ██ did not disclose

to ████████████████████████ the facts relating to ██ prominent role in ████

- 13 -



and any efforts on his part to serve as a recruiter or intermediary promoting the interests of the ▓ government or government-associated academic institutions.

29.     In or about September 2018, CHS-1 advised that ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, where she would attempt to recruit individuals to ▓ during a meeting scheduled to take place during the summit. In or about October 2018, CHS-1 advised that ▓▓▓▓ did host that recruitment meeting during the summit. According to a DHS database query, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Airport on October 7, 2018.

30.     A query of a website, ▓▓▓▓▓▓▓ revealed that ▓▓▓▓▓▓▓ is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ is a member university of ▓▓▓▓▓▓▓▓ two key, national construction projects that support the development of high-quality universities. According to the website, ▓▓▓▓▓▓ employs 22 distinguished professors of the ▓▓▓▓▓▓▓▓▓▓▓ and five scholars of the ▓▓▓ ▓▓▓▓▓▓▓▓.

31.     In or about January of 2019, another cooperating witness, hereinafter referred to as CHS-2, reported that ▓ branches in ▓ paid for ▓▓ travel in connection with his role as ▓▓ president in 2018. [6] CHS-2 also reported that those ▓ branches in ▓

_____

[6] CHS-2 has direct access to individuals associated with ▓, and has been providing information to the FBI for approximately 2.5 years. Much of CHS-2's information has been corroborated by the investigation conducted by members of the FBI and other law enforcement members. CHS-2 has not been paid for his/her information. CHS-2 provided information with the expectation of benefitting in his/her immigration status as a result of such cooperation.

were funded by the ▮▮▮government. CHS-2 further believes that ▮▮ behavior was indicative of ▮▮ government backing, based on CHS-2's understanding that ▮ had met regularly with a representative of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and on ▮▮ having managed to obtain his own research lab in ▮▮

▮▮ ▮ ▮▮▮

32.    A query of a website ▮▮▮ revealed information pertaining to the ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮ was distributed on or around July of 2016 by the ▮▮▮▮▮ ▮▮▮▮ and municipalities directly under the ▮▮▮▮, and ministries and commissions of the ▮▮▮▮ made several references to focusing efforts on the development of technologies related to gene editing, stem cells, synthetic biology, and regenerative medicine to life sciences, and biological breeding.

▮▮▮

33.    As noted above, ▮▮ publicly-posted C.V. listed his affiliation with the ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ from 2014. One of the responsibilities of ▮▮ is to compile and implement plans on national laboratories, innovative bases, national S&T (science & technology) programs, and research conditions so as to promote infrastructure construction and resource sharing on behalf of the ▮▮ government. A query of the website, ▮▮▮ outlined the major tasks of the ▮▮ as follows: "Consolidate a highly qualified contingent for basic research and cultivate a number of personnel with innovative capabilities. Establish and adhere to the strategic principle – 'people-orientated' to vigorously practice a talent strategy."

34.    A review of open source information, ███████████ revealed a June 29, 2018 online ██████ -language article on the ████████████████████████████ website, describing a meeting between a ██████████ delegation that included ██████ and representatives of the ████████████████████████████████. During the meeting ████████████████████████████████████████████████████ stated that ██████████ was a long-term partner of ██████ and has made outstanding contributions to the exchanges and cooperation between ██████ and American scientific and technological ██████ Also during the meeting, ██████ expressed his willingness to carry out specific and pragmatic cooperation with ██████ in the future, and to seek and recommend for the different needs of domestic employers.

35.    The ████████████████████████████, Connecticut Chapter ████████ ██████ is a non-profit organization with members from local pharmaceutical and biotechnology companies, research institutes, and universities, including Bristol-Myers Squibb, Alexion, Pfizer, ████████████████ the University of Connecticut, and others. According to its website, ████████ ████████████████ is a professional organization that promotes interactions and mutual assistance among its members, fosters professional exchanges and aid to ██████ students, advances cultural understanding between ██████ and other ethnic groups, and facilitates institutional and communal exchanges between entities in Connecticut and ██████. Its website also contains an article in ██████ characters that, according to translation software, describes an event co-hosted by ██████ ████████████████████████████████████████████████████ ██ on ██████████, ██████████████ in Shelton, Connecticut. The article's webpage

- 16 -



included several captioned photos. ███ appears in at least two photographs, one of which showed him holding a microphone; according to the caption, ███ spoke about the ███ activities for the past year.   Another posted photo depicted ████████████████████████████ ████████████████████████████ he was holding a microphone similar to that held by ███ and appeared in a similar outdoor setting.   The caption indicated that ████████████████████

████████████████████

36.     Based on my training and experience, including discussions with and information received from the FBI's ███ subject-matter experts, the ████████████ are programs established by the ███ government to recruit individuals with access to or knowledge of foreign technology or intellectual property. Through these plans the ███ government has created a significant financial incentive for foreign, talented individuals to transfer international technology and intellectual property to ███ licitly or otherwise. This has resulted in or contributed to numerous, significant violations of United States law, including (but not limited to) Economic Espionage, Theft of Trade Secrets, violations of International Trafficking in Arms regulations, violations of the Atomic Energy Act, and fraud against the U.S. government.   The following description of the ████████████ derives from information furnished by the FBI's ███ subject matter experts (paragraphs 40-41, 43-49, and 51), multiple, open-source news reports from the fall of 2018 (paragraph 50), and a 2015 description of ████████████ from the ████████████ an online, English-language publication of the ████████████ (paragraphs 39 and 42).

37.     By way of background, the ███ government established a national policy to identify and recruit individuals located outside ███ who have expert skills, abilities, and

knowledge that would aid in transforming ███████ economy and achieving the nationalistic goals of the ███████████████████████████████████ These programs, commonly called ███████████ have existed since the early 1990s, and recruit individuals to work on behalf of ██████

38.  ████████ reemphasized this national strategy for ███████ economic development in 2007 when ███████████ was added to the ███████████████████████ and became national policy in ████ with the passage of the ███████████████ ███████████████████. Also known as ███████████████████ this plan was jointly issued by ███████████████████ Leadership for the ████ ███████ efforts fell upon the ███████████████████ a secretive and important group within the ████ responsible for top personnel assignments in government and state-owned sectors.

39.  The ███████████ is an online English publication of the ███████████ the official paper of ███████████████████ According to a 2015 ███████████ article, ███████ ████████████████████████████████████████████████ ███████████████████ in order to work in management or research positions on long-term or short-term program across the country, particularly in areas of scientific or technological development."

40.  Currently, there are believed to be ███████████████████ including ████ ███████████████████████ established scientists, young scientists, and entrepreneurs, among others. The seminal, ███████████████ was initiated in 2009. It is officially known as the ███████████████████ and is commonly referred to as ███████████████████ Other ███████ include the ███████████████

- 18 -

███████████████████████████████████████████ and the ██████████████

██████████ municipalities created local ████████ under the framework put in place

by the ████████████████ and in accordance with its directives and requirements.

Through the program, the ██████ government recruits Western-educated individuals to work and

conduct technical and scientific research on behalf of ██ and in furtherance of ██████ strategic

national development goals. Each ████████ includes the same basic requirements: the applicant

should have experience in cutting-edge foreign science or engineering research; possess a degree

from a prestigious university; and have several years of overseas work or research experience at

prestigious universities, research institutes, corporations, or well-known enterprises.

41.     To entice high-caliber applicants—particularly applicants willing to relocate to

████████████████████████████████ with significant financial and social

incentives.   Each ██████████ draws a salary from a ████████████████ such as a

laboratory or research organization, which sponsors or facilitates applications.  These salaries often

meet or exceed salaries the ██████████ draw through their █████████████████ For

████████████████ the ██████ government has been known to provide US \$150,000

as a signing bonus, and an additional US \$450,000-\$750,000 over time to support their research.

Additional funding is available depending on the ████████████ level of expertise and quality of

performance in meeting ██████████ The ██████ government may also supply free housing

or a generous housing allowance, high-quality schooling for children, jobs for spouses, healthcare,

and significant tax breaks.   ██████████ funding is almost always provided tax-free.

42.     The ██████████████ article cited in paragraph 39, above, described

compensation and benefits offered through one of the ████████████ the 1,000 ████████

██████████ "Each ████████ in a long-term program will receive a ██████████ subsidy

from the ▮▮ government. 2. ▮▮▮▮ undergoing scientific research can apply for a ▮ ▮▮▮▮ research fund. 3. Special funds are offered to ▮▮▮ to subsidize their pension and health insurance." Additional benefits granted include beneficial and relaxed visa policies; pension, insurance, and health care benefits; accommodation and housing benefits, to include the right to buy property in ▮▮ or in some cases free housing or a housing subsidy supplied by the ▮▮▮▮▮ spousal benefits, including pre-arranged jobs or, if a job cannot be provided, a stipend given to the spouse that approximates the average ▮▮▮ salary; salaries matching or exceeding the income ▮▮▮ members could have earned working outside ▮▮ as well as education subsidies for their children; and tax-free status on many of the ▮▮▮ benefits and monies, to include the ▮▮▮▮ subsidy given to ▮▮▮ ▮▮▮▮ The same article describes extra monetary rewards that should be given for significant contributions, saying, "For foreign experts making a great contribution, the employer should award them with stock shares or options, or a supplementary pension. There is no fixed definition of a 'great contribution', but it should be something along the lines of a financial expert helping the company achieve huge profit growth, a technological expert making an important breakthrough, or an intellectual property owners [sic] giving the ▮▮ company the right to manufacture their product." In this way, ▮▮▮ are heavily incentivized to introduce foreign technology to ▮▮

43.     Individuals recruited into the ▮▮▮▮▮ are required to perform research or develop technology in ▮▮ based on legally binding contracts they receive as part of the program. These contracts are standard legal documents and specify the parties involved in the agreement, the terms of the agreement, the obligations of each party, and legal recourse available to each if the contract is broken. ▮▮▮ contracts typically include language

- 20 -

specifying compliance with ███████ national laws, including its national laws on corporate espionage. Most ██████ █████ specify all intellectual property developed or created by the ████████ █████ is property of the ██████ employing unit.

44.  ███████ contracts also specify the length and nature of the required work. These contracts obligate the Recruits to work for a specified period of time in ██████ and often detail the specific research the ███████████ will perform or specify the business that is to be developed by the proposed new company.  The contract can be for either part-time or full-time employment under the program. ███████████████ spend nine months or more each year in ██████ while part-time recruits continue to work primarily in the United States and travel intermittently to ███████

45.  ███████ contracts almost always specify significant goals to be accomplished during the term of their contract. Failure to meet ████████ contract goals can result in the loss of funding or dismissal. This contractual obligation closely resembles or even replicates the work the ████████ performs or performed for his or her U.S. employer, thus demonstrating the ████████████ willingness to leverage knowledge and intellectual property obtained from U.S. businesses, corporations, and even U.S. government laboratories. Due to the similarities between ████████████ work in the United States and the ███████████ research they are obligated to perform in ██████ many ███████████ eventually draw upon their knowledge and experience derived from their former positions in the United States, resulting in unauthorized and often illegal transfers of intellectual property from the United States to ██████

46.  Individuals in the United States and ████ often facilitate the process of identifying and recruiting ████████ into the various ████████ These ████████████ often have contracts that obligate them to identify and recruit foreign experts to work in ██████ either as part of a ████████ or in some other capacity. In many cases, ████████ contracts also require ██████

- 21 -



█████ o identify additional overseas talent to join his or her █████ research team in █████ resulting in a cell-based recruitment model in which █████ also become *de facto* █████ █████ This contractual relationship differentiates the █████ from standard scientific research or conventional international collaboration.  Rather than merely conducting research or engaging in academic pursuits, █████ are also contractually obligated to perform services for █ n support of its strategic development goals and economic revitalization, following guidelines and requirements set forth by the █████ namely, recruiting others to work for and in █████ In this way, █████ contracts incur dual and disparate obligations: to pursue traditional academic or research activities, and also to act as representatives of the █████ advocating, influencing, and recruiting others in support of █████ political goals. In facilitation of this goal, early █████ were trained at the █████ a development one █████ scholar termed as "unprecedented".

47.    Other individuals, typically in █████ function as administrative points of contact for prospective and current █████ These individuals either identify prospective █████ █████ hrough their own research or have the █████ directed to them from █████ █████ These " █████ typically work for the organization in █████ at which the █████ will fulfill their contract, and they assist with preparing and refining the required █████ are apprised of current █████ requirements put forth by the █████████████ They ensure the prospective recruits meet the government's recruitment requirements and advise the recruits to ensure their application satisfies the current recruitment directives.

48.    █████ have advised prospective █████ to describe their work on U.S. military research, or other U.S. defense projects, on their █████

- 22 -

████████     In some cases, these ████████████████ later ask applicants for information

about the work the applicant performs or has performed, including materials known to be sensitive,

the proprietary intellectual property of a foreign company, or requiring a license for export from

the United States to ████████ government guidance on ████████████ provides

that ████████ must provide evidence of the work they performed on projects they list on

their applications, such as research results or innovative achievements. In one case, a ████████

████████████████████ the work he conducted in the United States was proprietary

and export controlled. The ████████ acknowledged this and indicated it was not an issue

for the ████████████ Shortly after being accepted into the ████████ (in this case, the

████████████████████████████ the ████████ was contacted by

the ████████ and advised he would need to prove he had worked on the projects listed on

his ████████████ These projects included U.S. defense projects related to military jet

engine designs. The ████████ believed the ████████ was asking to see the actual

project data, and subsequently took the export controlled defense information with him to his

████████████

   49.   ████████████ have also been observed to either apply for or continue to use U.S.

government grant funding while concurrently under contract with the ████████ government via the

████████ and without disclosing their participation or foreign funding on the U.S. government

grant application. Other ████████████████████ have performed duties as part of the

peer review process while failing to disclose their foreign contractual obligations via the ████████

████████ This resulted in a compromise of the U.S. government grant-funding process, leading to

numerous Inspector General investigations, criminal charges, and civil settlements related to

misuse of U.S. government funds.



50.    The ████ government has taken active steps to protect both its ████ and also its ████ from increasing scrutiny by the United States government, following the arrest of an individual associated with the ████ in the summer of 2018. Multiple, open-source news accounts from the fall of 2018 reported that the ████ government directed various ████ to cease overtly recruiting for ████ in the United States, indicating they should instead invite U.S. scientists and researchers to come to conferences and forums instead of calling it a job interview or using the term ████ The same document directed ████ to change their communication tactics with potential recruits, directing them to use methods other than email, such as telephone or fax. The document's existence has been reported by several international media outlets, and verified by FBI source reporting.



51.    In spite of the ████ government's recent efforts to minimize the ████ digital footprint, the ████ has historically been conducted almost exclusively via digital communications, primarily via email, and appears to continue as such. In many cases, a ████ uses his employment email address to establish *bona fides*, then transitions to personal email accounts to complete the process. A review of ████ webpages on November 27, 2018, identified email addresses continuing to be listed as primary forms of communication to apply for various ████ These webpages, and others like them, provide the necessary information to apply for the program, including digital application forms and processes to digitally submit the applications to ████ ████ have been observed to routinely complete applications using these digital methods, both on local physical devices and in the digital "cloud". The applicants then send them electronically to ████ who work with the applicants to refine the applications using

- 24 -

various forms of digital communication, including email, telephones, voice over IP (VOIP) technology, text messages, private messaging applications such as WeChat, and other forms of digital communication.



52.    In or around December of 2016, a query of a webpage in ▮▮▮ associated with the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ revealed biographical and publication research associated with ▮▮▮ A translation of the text revealed that ▮▮▮ was interested in recruiting "high-level talents" to the university. The article provided a link for information in regards to available positions, and identified both ▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as email contacts.  A review of the aforementioned link for additional information in regards to recruitment revealed that ▮▮▮ tiered potential applicants in terms of desirability; these tiers included qualifications, including but not limited to affiliation with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ selection of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ selection of the ▮▮▮▮▮▮▮▮▮▮▮▮ and selection as a ▮▮▮▮▮▮▮▮ Each tier included corresponding salary/benefit information.

53.    In or around December of 2016, a query of a webpage in ▮▮▮ associated with ▮▮▮ revealed an article dated in or around May of 2016 referencing a unified action for high-level talent recruitment in ▮▮▮ and abroad. The article identified ▮▮▮ as a contact for individuals interested in positions at ▮▮▮ The article also referenced ▮▮▮ as being responsible for communication and promotion matters concerning the president's delegation of ▮▮▮ visit and recruiting event in Boston on ▮▮▮▮▮▮ That same month, the Boston Business Journal

reported that "[i]n recent years, Greater Boston has been recognized as the world's center for biotechnology research and development."[7]



54. The website ███████████ includes an article dated September 5, 2014, written in ███████████ Translated, the article consists of a ███████████ part of the ███████████ It describes ███████████ as the most internationalized university in ███████████ having a strategic development goal of building a domestic first-class university, for which it seeks to recruit individuals, "at home and abroad," specializing in the biomedical field for post-doctoral work. The article identified five individuals associated with this recruitment effort, along with their contact information. One of those five recruitment contact persons was ███ his listed contact information was ███████████ The article described ███ as a ███████████

55. As of March of 2019, the website associated with ███████████ displayed an article in ███████████ dated February 26, 2018. Per a software program translation, the article described how ███ vigorously implements the strategy of strengthening the city through [gathering] talents," from both ███ and abroad. The article specifically described the

---

[7] Boston business Journal, ███████████

2015 efforts of ████████████████████████ who led the establishment of the ████████████████████████████ then arranged for laboratory members to obtain special research and training at the ████████████████████ The article further described ████ having assembled a 16-person "innovation team," which received seven grants in three years from the ████████████████████ As of March 2019, the website of the ████████████████████████ described the latter as an institution directly under the jurisdiction of the ██████ tasked with the administration of the ████████████████████████

████████████████████

56.     As of March of 2019, the website of the provincial government of ████████████ ████ displayed a document that, per a software program translation, was jointly posted by the



████ Referencing talent plans for the year 2016, the document expressed ████████████ "urgent need" for "high-end foreign experts." It specifically identified ████ as one of the province's "high-end" foreign experts, and listed his employment at both ████████████████ ████████████████████████ The posted talent plan document provided guidance for overseas individuals selected to participate, directing such individuals to a website of the ████████████████████████████████ The latter website describes ████ mission as the international exchange of specialized technical and managerial personnel; it further describes ████ as "vigorously supported by the ██████ government, . . . under the direct guidance of the ████████████████████████ ████

- 27 -

████████████████████████████████████

57.     In January 2019, the government applied for, obtained, and served Orders under 18

U.S.C. § 2703(d), directing the respective Service Providers for TARGET ACCOUNTS ONE,

TWO, THREE, AND FOUR to provide certain account information, including all "to" and "from"

headers for E-mail traffic on those accounts, from January 2014 to the present.   Analysis of the

response to those Orders has disclosed significant contacts between ████████████████████

government.  Most prominently, TARGET ACCOUNT ONE showed ███ having contact on 33

separate occasions with e-mail account ██████████ between May 2014 and January 2015.

This account has been identified as belonging to ████████████████████

███ Specifically, both that name and that e-mail address appear on a non-immigrant visa

application dated 01 September 2017, submitted by ████ for a child traveling to the United

States.  Also, U.S. State Department records disclose that on November 8, 2013, the United States

issued ████ an A1 visa, which visas are specifically issued for diplomatic and consular officers.

The visa had a five year term, that is, effective from November 8, 2013 through November 8, 2018;

it listed ████ sponsoring organization as the ████████████████

The 2013 visa application identified ████ then-employer as ████████████

████████████

58.     Pertinent records also disclose eight phone calls between ██████████████

██ n the year 2016: five initiated by ████ and three by ████ Specifically, records obtained

from Sprint Corporation in September 2018 identified the telephone number ██████████ as

subscribed to by ███ Records of a U.S. State Department database identified telephone number

██████████ to be associated with ████ Sprint Corporation phone records disclosed the eight

contacts between those two numbers in 2016.

59. Evidence that ██████ recruitment activity for ██████████████ was not limited to the years 2014-2016 includes ██████ extensive activities in 2018 as President of ██████████████ such as, his participation in ████████████████████ ████████████████████████████████ – as documented in paragraphs 21 through 31, above.



### Failure to Register

60. In or around September 2018, the Justice Department's Foreign Agents Registration Unit advised, based on a search of the Unit's pertinent databases, that PAN had never registered or given notice to the Attorney General of his status as a foreign agent in compliance with 18 U.S.C. § 951.

### Unregistered Foreign Agent Statute

61. The unregistered foreign agent statute, 18 U.S.C. § 951, provides in section (a):

(a) Whoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both.

In section (d), the statute lists certain exceptions from its coverage, which include sub-section (d)(4), specifically:

(d) For purposes of this section, the term "agent of a foreign government" means an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official, except that such term does not include—

. . .

(4) any person engaged in a legal commercial transaction.

62. I have been advised by the U.S. Attorney's Office that none of the exceptions of sub-section (d), including the "legal commercial" exception of sub-section (d)(4), is deemed an

"element" of the crime, for which the government would bear the burden of proof, but rather constitutes an "affirmative defense," and hence is not relevant to either a probable cause determination or the sufficiency of an indictment. The U.S. Attorney's Office has pointed out several judicial decisions holding that statutory exceptions to criminal conduct – including 18 U.S.C. § 951(d) – define affirmative defenses, not elements of the crime, including among others: *United States v. Reza-Ramos*, 816 F.3d 1110, 1120 (9th Cir. 2016) (in general, a "statutory exception" to a criminal offense "is in the nature of an affirmative defense"); *United States v. Mayo*, 705 F.2d 62, 75 (2d Cir. 1983) (noting that the definitional section of illegal firearms possession statute "creates an affirmative defense in the form of an exception"); *United States v. Duran*, No. 07-20999-CR, 2008 WL 11333989, at *1–2 (S.D. Fla. Oct. 10, 2008) (specifically finding that under unregistered foreign agent statute, "[s]ection 951(d) provides statutorily created exceptions to the offense defined in Section 951(a), and . . . these exceptions, including for 'any person engaged in a legal commercial transaction,' *do not constitute essential elements of the crime . . . [but rather constitute] affirmative defenses* to the crime described in Section 951(a)." (emphasis added)). The U.S. Attorney's Office also has pointed out several judicial decisions holding that the possible existence of affirmative defenses does not negate probable cause, both in the arrest context and in the indictment context, for example: *United States v. Sisson*, 399 U.S. 267, 88 (1970) ("It has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses."); *Assenberg v. Whitman Cty.*, 730 F. App'x 429, 432–33 (9th Cir. 2018) ("an affirmative defense does not defeat probable cause"); *Humphrey v. Staszak*, 148 F.3d 719, 724 (7th Cir. 1998) ("[A]n affirmative defense in a criminal case . . . is not part of our Fourth Amendment probable-cause-to-arrest analysis. . . . We note, for argument's sake, that . . . probable cause to arrest is not necessarily negated by a defendant's successful assertion at trial of an

entrapment defense."). Accordingly, the question of whether ███ activities on behalf of the ███████████ were or are limited to just "legal commercial transaction[s]" is irrelevant to the probable cause analysis at this stage of the investigation.

63.     The United States Attorney's Office also has advised that courts in cases such as the following have interpreted 18 U.S.C. § 951 as defining a "general intent" crime, which means the statute does not require proof that the defendant knew of the requirement to register as a foreign agent: *United States v. Campa*, 529 F.3d 980, 998-999 (11th Cir., 2008); *United States v. Dumeisi*, 424 F.3d 566, 581 (7th Cir.2005) ("Knowledge of the requirement to register is not an element of § 951.").

## V.     TARGET ACCOUNTS ONE AND TWO AND BACKGROUND CONCERNING EMAIL

64.     In or around August of 2018, a review of records provided by ███████████ revealed the subscriber for TARGET ACCOUNT ONE to be ███████████

65.     In or around December of 2016, a query of a ███████████ revealed a ███████████████████████████ The webpage identified both TARGET ACCOUNT ONE and TARGET ACCOUNT TWO as associated with ███

66.     In my training and experience, I have learned that e-mail service providers offer a variety of online services, including electronic mail ("email") access to the public. For example, ███████ allows subscribers to obtain email accounts at the domain name ███████ like the email account listed in Attachment A. Subscribers can obtain an account by registering with ███████ (hereinafter "the service provider"). During the registration process, the service provider asks subscribers to provide basic personal information. Therefore, the computers of the service provider are likely to contain stored electronic communications (including retrieved and

- 31 -

un-retrieved email for the subscribers) and information concerning subscribers and their use of the service providers' services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

67.     A service provider subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by the service providers. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

68.     In my training and experience, the service providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, this information often provide clues to their identity, location or illicit activities.

69.     In my training and experience, email service providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records

of login (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email service providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

70.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email service providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

71.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contact lists,

and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email service provider can show how and when the account was accessed or used. For example, email service providers typically log the IP addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## VI.   TARGET ACCOUNT THREE AND BACKGROUND CONCERNING ████████████

72.   In or around August of 2018, a review of records provided by ████ revealed the subscriber for TARGET ACCOUNT THREE and for TARGET ACCOUNT FOUR to be

████████████████████████████

73.   ████████ s a United States company that produces the ████████████████ all of which use ████████████████████ also produces desktop and laptop computers based on ████████████████████ provides a variety of services that can be accessed from ████████████ or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

a.   ████████ provides email service to its users through email addresses at the domain names ████████████████████

b.   ████████████████████ allow users of ████████████ to communicate in real-time.  ████████ enables users of ████ devices to exchange instant messages ████████████ containing text, photos, videos, locations, and contacts, while ████████ enables those users to conduct video calls.

---

[8] The information in this section is based on information published by ████████ on its website, including, but not limited to, the following document and webpages: ████████████





c. ▮▮▮ is a file hosting, storage, and sharing service provided by ▮▮▮ ▮▮▮ can be utilized through numerous ▮▮▮ connected services, and can also be used to store ▮▮▮ device backups and data associated with third-party apps.

d. ▮▮▮ connected services allow users to create, store, access, share, and synchronize data on ▮▮▮ or via ▮▮▮ on any Internet-connected device. For example, ▮▮▮ enables a user to access ▮▮▮ provided email accounts on multiple ▮▮▮ and on ▮▮▮ ▮▮▮ can be used to store and manage images and videos taken from ▮▮▮ allows the user to share those images and videos with other ▮▮▮ can be used to store presentations, spreadsheets, and other documents. ▮▮▮ enables ▮▮▮ to be used to synchronize webpages opened in ▮▮▮ ▮▮▮ a suite of productivity apps ▮▮▮ enables ▮▮▮ to be used to create, store, and share documents, spreadsheets, and presentations. ▮▮▮ enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple ▮▮▮

e. ▮▮▮ social gaming network, allows users of ▮▮▮ to play and share games with each other.

f. ▮▮▮ allows owners of ▮▮▮ devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.

g. ▮▮▮ allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.



     h.    ▮▮▮▮▮▮▮▮▮▮▮▮ are used to purchase and download digital content. ▮▮▮▮ can be purchased and downloaded through ▮▮▮▮▮▮▮▮ or through ▮▮▮▮▮ on desktop and laptop computers running either ▮▮▮▮▮▮▮▮▮▮ Additional digital content, including music, movies, and television shows, can be purchased through ▮▮▮▮ on ▮▮▮▮▮ and on desktop and laptop computers running either ▮▮▮▮▮▮▮▮▮

    74.   ▮▮▮▮▮ are accessed through the use of an ▮▮▮▮▮ an account created during the setup of an ▮▮▮▮ or through the ▮▮▮▮▮▮▮ A single ▮▮▮▮ can be linked to multiple ▮▮ services and devices, serving as a central authentication and syncing mechanism.

    75.   ▮▮▮▮▮ takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an ▮▮▮▮▮ email address (often ending in ▮▮▮▮▮▮▮▮ or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The ▮▮▮ can be used to access most ▮▮ services (including ▮▮▮▮▮▮ only after the user accesses and responds to a "verification email" sent by ▮▮ to that "primary" email address. Additional email addresses ▮▮▮▮▮▮▮▮▮▮▮ can also be associated with an ▮▮ by the user.

    76.   ▮▮▮ captures information associated with the creation and use of an ▮▮▮ During the creation of an ▮▮▮ the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by ▮▮ The subscriber information and password associated with an ▮▮ can be changed by the user through the ▮▮▮▮▮▮▮ on

website. In addition, ███ captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

77.     Additional information is captured by ███ in connection with the use of an ███ ███ to access certain services. For example, ███ maintains connection logs with IP addresses that reflect a user's sign-on activity for ███████████████████████████ ████████████████████████████ pages on ███ website. ███ also maintains records reflecting a user's app purchases from ███████████████████████████ ████████ alls, and ████████ for activity over an ████████ email account. Records relating to the use of the ████████ service, including connection logs and requests to remotely lock or erase a device, are also maintained by ███

78.     ███ also maintains information about the devices associated with an ███ When a user activates or upgrades an ████████ captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's ███ is linked to an ███ when the user signs in to ████████ ████ also may maintain records of other device identifiers, including the ████████████████████████ ████████████████ and the serial number. In addition, information about a user's computer is captured when ███ is used on that computer to play content associated with an ████████ and information about a user's web browser may be captured when used to access services through ████████████████ also retains records related to communications



between users and ▮▮▮▮ customer service, including communications regarding a particular ▮▮▮▮▮▮▮▮▮▮▮▮ and the repair history for a device.

79.   ▮▮▮▮ provides users with ▮ gigabytes of free electronic space on ▮▮▮▮ and users can purchase additional storage space.  That storage space, located on servers controlled by ▮▮▮▮ may contain data associated with the use of ▮▮▮▮ connected services, including: email ▮▮▮▮▮▮ images and videos ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ documents, spreadsheets, presentations, and other files ▮▮▮▮▮▮▮▮▮▮ and web browser settings and Wi-Fi network information ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ can also be used to store ▮ device backups, which can contain a user's photos and videos, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮▮ messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data.  Records and data associated with third-party apps may also be stored on ▮▮▮ for example, the ▮▮▮▮▮▮▮▮▮▮ an instant messaging service, can be configured to regularly back up a user's instant messages on ▮▮▮ Some of this data is stored on ▮▮▮ servers in an encrypted form but can nonetheless be decrypted by ▮▮▮

80.   In my training and experience, evidence of who was using an ▮▮▮ and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

81.   For example, the stored communications and files connected to an ▮▮▮ may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in

- 39 -

furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

82.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by ▮▮▮ can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

83.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

84.     Other information connected to an ▮▮▮ may lead to the discovery of additional evidence. For example, the identification of apps downloaded from ▮▮▮▮▮▮ may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity,

- 40 -

documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

85.     Therefore, ███████ servers are likely to contain stored electronic communications and information concerning subscribers and their use of ███████ services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## VII.  CONCLUSION

86.     Based on the facts set forth in this Affidavit, there is probable cause to believe, and I do believe, that ███ has been and continues to be knowingly and willfully working in the United States on behalf of government-controlled and government-directed entities of the ███████ ███████ for the purpose of recruiting high-level molecular geneticists and stem cell researchers to work at state-controlled universities and laboratories in ███ and for the purpose of acquiring and transferring to those state-controlled universities and laboratories, cutting-edge molecular genetics and stem-cell research and technology developed at leading academic and private sector research platforms in the United States; and that those efforts are undertaken in strict conformity with the ███████ government's publicly-declared national security objectives of technology transfer and human capital acquisition; and that ███ has used all of the TARGET ACCOUNTS (two of which consist of the same e-mail account, but retained in two separate companies' storage systems, subject to each company's separate storage protocols), in support of these efforts.  Specifically, there is probable cause to believe, and I do believe, that ███ has been working as a ███████ in one or more of the ███████ ███████ described above in paragraphs 46-47; and that there is evidence of his involvement in ███████ at least as far

back as 2012, based on ███ own publicly posted C.V. for "████████████ which

lists his role as a ████████████████████████████████ from

2012-2015, as noted in paragraph 11.g., above.  As also explained above, the evidence for this

conclusion includes, among other things: (1) ████ primary residence and employment in ████

where he directs a research laboratory and chairs the Department of Biochemistry and Molecular

Biology at a university in ████████ that operates under the direction of the ████

████████████████ (2) that same university department's web-page

listing ████ along with ████ TARGET ACCOUNT ONE and TARGET ACCOUNT THREE,

as primary contacts for recruiting overseas, high-level research scientists in biochemistry and

molecular biology, consistent with the publicly-declared ████████████

████████████████████████ (3) ████ prior, 2014

listing as one of five contact persons for the international recruitment of post-doctoral biomedical

experts  at  ████████████████  which  listed

TARGET ACCOUNT TWO for potential recruits to use to contact ████ (4) ████ listing on his

publicly-posted C.V., his affiliation with the ████████████████

████ the expressed purpose of which is to acquire scientific talent, technology, and

infrastructure for ████ (5) ████ having successfully acquired access to the highest levels of

American research and technology in the fields of molecular genetics and stem-cell research,

through his joint roles as a consultant-researcher at ████████████ and as the co-

founder of an advanced stem cell research company in Connecticut, the latter having been

substantially financed by ████ government-controlled pharmaceutical industry conglomerate;

(6) ████ more than thirty, documented e-mail exchanges in 2014-2015 over TARGET

ACCOUNT ONE with the ████████████████████ who was

- 42 -

previously employed at ███████████████████████████ (which as noted, is deeply

involved in the ████████ and ███ eight documented contacts with that same Vice-

Consul's telephone in 2016; (7) ████ continued, central role in recruiting top-level scientific

talent for ██ in his recent role as President and prior role as Vice-President and academic

committee principal of ██████████ that is, the ███████████████████████

████████████████████████ which latter organization is a constituent member of the

███████ overnment's top political advisory body, and which is publicly listed by the ████████

government as a long-term partner of its ████████████████████████████████

██████ initiatives; (8) also, in his capacity as President of ██████████████ having hosted

its annual conference ██████████ in conjunction with ████████████████████

████████████████ for the express purpose of promoting "U.S. ████ technological and

economical exchange," and which conference was attended by Chinese government officials

seeking to recruit scientists and researchers for ████ as part of its "talents matchup" initiatives;

(9) ████ leading role in promoting a recent recruiting trip by a Presidential delegation from his

university in ██████████████ to Boston, the "world's center" of biotechnology research and

development; and (10) recent U.S. government reports cited above, which document the concerted

efforts of the government of ████ to acquire the fruits of cutting-edge American scientific

research and technological applications, including but not limited to biotechnology, which efforts

involve intellectual property thefts on a massive scale, ████████████████████████████

87.    Accordingly, there also is probable cause to believe, and I do believe, that ████ is

working in the United States as an agent of a foreign government, namely ██████████████████

██████ that a significant share of ████ efforts in this regard are conducted via email; and based

on searches of the pertinent government databases, there is probable cause to believe that ████ has

- 43 -

failed to register or otherwise give notice to the Attorney General of his status as a foreign agent, in violation of 18 U.S.C. § 951.

88.     There is also probable cause to believe, and I do believe, that evidence, contraband, and instrumentalities of criminal activity, as described more fully in Attachment B to this affidavit, will be found in the TARGET ACCOUNTS.  Specifically, there is probable cause to believe that the TARGET ACCOUNTS will contain, among other items, E-mail messages facilitating and/or concerning the Subject Offense discussed above, as well as E-mail addresses and other information about co-conspirators and/or persons unwittingly facilitating the unlawful acts.

89.     Accordingly, I respectfully request that the Court issue warrants authorizing a search of the TARGET ACCOUNTS, as more fully described in Attachment A, for the items listed in Section I of Attachment B and Attachment C, and authorizing the seizure of items listed in Section II of Attachment B and Attachment C.

## VIII.   REQUEST FOR NON-DISCLOSURE ORDER

90.     I also request, pursuant to the preclusion of notice provisions of 18 U.S.C. § 2705(b), that the service providers listed above in connection with the TARGET ACCOUNTS be ordered not to notify any person (including the subscriber or customer to which the materials relate) of the existence of this affidavit, the application, and the search warrant for an initial period of 180 days, renewable as may be necessary by request of the Government and with approval of the Court.  I submit that such an order is justified because notification of the existence of this Application and Search Warrant would jeopardize and risk shutting down the ongoing investigation.  Such a disclosure would give the subscriber an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.

## IX.   REQUEST FOR SEALING

91.   It is also respectfully requested that this Court issue an order sealing all papers submitted in support of this application, including the application and search warrant, for an initial period of 180 days, renewable as may be necessary by request of the Government and with approval of the Court. I believe that sealing this warrant and application is necessary because the items and information to be seized are relevant to an ongoing criminal investigation. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, often by posting them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Daniel C. Veale
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 29th day of March, 2019.

ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

- 45 -

## TARGET ACCOUNTS THREE AND FOUR

### ATTACHMENT A
**Property to Be Searched**

TARGET ACCOUNT THREE:

████████████████████████████████████████

From January 1, 2012, to the present.

AND

TARGET ACCOUNT FOUR:

████████████████████████████████████████

From January 1, 2012, to the present.

This warrant applies to information associated with TARGET ACCOUNT THREE and TARGET ACCOUNT FOUR that is stored at premises owned, maintained, controlled, or operated by ████████████████████████████████████████
████████████████████

TARGET ACCOUNTS THREE AND FOUR

**ATTACHMENT B**
**Records to be Seized**

**I. Information to be disclosed by** ▮▮▮▮▮

To the extent that the information described in Attachment A is within the possession, custody, or control of ▮▮▮ including any messages, records, files, logs, or information that have been deleted but are still available to ▮▮▮▮ or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), ▮▮▮ is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, account status, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized ▮▮▮▮▮ and computers, and any devices used to access ▮▮▮ services), including ▮▮▮▮▮▮▮▮

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

c.      From inception through the present: The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.      From inception through the present: The contents of all instant messages associated with the account, including stored or preserved copies of instant messages █████ ████████████████████████████ sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.      From inception through the present: The contents of all files and other records stored on ██████████████ device backups, all ██████ and third-party app data, all files and other records related to ████████████████████████████████████████████ █████████ and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.      From inception through the present: All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including ████████ call invitation logs, mail logs ██████████████ (including purchases, downloads, and updates of ████████ and third-party apps), messaging and query logs (including ████████████████████████████ sign-on logs for all ████████ ████████████████████████████ activation and upgrades, and logs associated with web-based access of ██████ services (including all associated identifiers);

g.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to ████████████████████████████████████ ████████████████

## II. Information to be Seized by the Government

All records and or data on the Devices described herein that relate to violations of Title 18, United States Code, § 951 involving ▓▓ co-conspirators, and/or associates, including: *for the period of January 1, 2012 – present*

a.   Direct and indirect communications for the purpose of directing, planning, collecting, or transmitting information to or from representative(s) of the Government of ▓▓

b.   Direct and indirect communications for the purpose of obtaining and transferring molecular, genetic, and/or biochemical research and/or technology from the United States to any university, research institute/laboratory, and/or company directly or indirectly subject to control by the Government of ▓▓

c.   Direct and indirect communications concerning meetings with individuals associated with and/or acting on behalf of the Government of ▓▓

d.   Direct and indirect communications to or from any co-conspirators and/or associates that relate to the above-listed criminal offence or to the genesis and development of the relationship between co-conspirators.

e.   Communications, documents, or internet history evidencing efforts to avoid detection, including but not limited to the use of aliases and encryption.

f.   Names, identities, and contact information of co-conspirators to include any identifying information.

g.   Information related to financial transactions to include bank records, checks, wire transfers, account information, and any other financial records.

h.   Information regarding ▓▓ and/or any co-conspirator's travel.

i.   Any documents related to tasking or work conducted, directly or indirectly, on behalf of the Government of ▓▓ and/or its representatives.

j.   Any records related to the recruitment of individuals from the U.S. to ▓▓ ▓▓

k.   Records evidencing the use of the Internet to include records of IP addresses used and internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet

l.   Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

m.  Evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and

n.  Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information).